– Yaya Jallow v. – Judge Hon.

**United States District Courts**
**Southern District of New York**

**23 CV 3969**

Yaya Jallow,
 Plaintiff,
   v.
*Edward I Geffner, Project Renewal,*
*Leticia Randle,*
*Robert Lashley,*
*Letitia James, State of New York,*
*Yvelyse Marrero, Samaritan Daytop Village Inc,*
*John McDonald, The Doe Fund Inc,*
*Rogers Avenue Housing Development Fund Corporation,*
*Louis A Molina, New York Department of Corrections,*
*David Terrel,*
*Joshuas Maye,*
*Raheen Rivers,*
*Lawrence Mckenzie,*
*David Bell,*
*Milton E. Calderon,*
 Defendants.

Case No.
Complaint

*Judge Hon.*

### Complaint for Declaratory Relief & Compensatory Damages

### I. Introduction

1. The Plaintiff, in proper person, is filing this complaint and respectfully requesting a declaratory judgment and compensatory damages against the aforementioned Defendants for violating The Plaintiff's rights, liberties, & property. The Plaintiff would become a victim of a(n) Enterprise(s) that would use threats, intimidation, harassment, & corruption to attempt to destitute, disenfranchise, & ultimately murder, if not force suicide of, him. The Plaintiff would experience discrimination on a level and magnitude that would warrant an obvious explanation of a willful and intentional scheme to destitute and disenfranchise him all under the gauze of explicitly fabricated fallacies, that were unknown to be fallacies from the very beginning, since The Plaintiff was an infant, and in the face of countless invalidating facts, figures, & information said Defendants would intentionally execute their actions, schemes, & acts under the protection of "qualified immunity" provided to them through their associates.

### II. Claim

2. *The Plaintiff was intentionally, willfully, & knowingly discriminated against and supposedly disenfranchised by several Enterprises ran either directly by or through the Associates and/or Friends of aforementioned Defendants that would victimize, destitute, and rob The Plaintiff on multiple occasions and attempt to use threats and intimidation to force The Plaintiff into acceptance and submission of their actions and ultimately attempt to murder him when he wouldn't.*
3. *The Plaintiff would be discriminated under the gauze that he lacked any proper standing, all fabricated, or right or liberties to justify willingly & intentionally not being discriminated against by the Judiciary consisting of the New York Unified Court System.*
4. *The Plaintiff would experience discrimination on the basis of his race; color; preconceived national origin, sexual orientation, & disability; sex; & familial status.*

### III. Jurisdiction & Venue

5. The Plaintiff brings this case pursuant to *18 U.S.C §241, 18 U.S.C §249, 42 U.S.C §3631, 18 U.S.C §245, 18 Chapter 95, Civil Rights Act of 1968, & the 14th Amendment.*

1:20-cv- – Yaya Jallow v. – Judge Hon.

6. This case presents a federal question within this Court's jurisdiction under Article III of the United States Constitution & 28 U.S.C. §1331, §1343, §1332.

   1. *"Are the Personnel/Employees of The New York Shelter System Operating An Enterprise?"*
   2. *"Are the Supervisory Personnel Willfully & Knowingly Turning A Blind Eye to said Enterprise(s)?"*
   3. *"Is Said Enterprise(s) Also Consisted of known and/or unknown Associates and/or Friends of Said Personnel/Employees?"*
   4. *"Is Said Enterprise(s) Using Racketeering Tactics and Methods to Steal From Their Clients?"*
   5. *"Was The Plaintiff's rights, liberties, & properties willfully, intentionally, & deliberately violated by said Enterprise(s)?"*
   6. *"Was The Plaintiff willfully and intentionally discriminated against and attempted disenfranchised by the New York Unified Court System, their personnel, & personnel's associates and/or friends?"*
   7. *"Was the discrimination exhibited by the New York Unified Court System willfully and intentional predicated on fallacies that were known to be fallacies, regardless of the possibility or reasonable standard of holding such fallacies?"*

7. Declaratory relief is authorized by 28 U.S.C. §2201 and §2202.
8. Compensatory damages is authorized by 42 U.S.C §1981 and 18 Chapter 95.
9. Venue is proper in This Court under 28 U.S.C §1391 because one or both parties reside in this district and a substantial part of the events given rise to this claim occurred in this district.
10. The Plaintiff does not seek a jury trial and designates Manhattan as the place for trial.

### *IV. Cause of Action*
### *Civil Rights Act 1968*

11. The Civil Rights Act of 1968 prohibits discrimination of any form, especially in public places & accommodation, on the basis of race, color, religion, sex or national origin.
12. Through this act The Plaintiff is protected from any form of discrimination on the basis of his race, color, religion, sex, or national origin which would be the basis for the countless forms and shows of discrimination he has experienced as outlined in this complaint.
13. The Plaintiff would be treated as a stereotypical caricature of a black male, with the operating focus being on treating him like a criminal due to his race, sex, & color. The Plaintiff would be treated and depicted like he was mentally unstable, a racial dog whistle as old as "crack babies" if not older, black male that was a trouble maker and a danger to himself and the general public at large.
14. The Plaintiff would be treated like an immigrant, an ode to his immigrant mother, that didn't have any rights and when he would attempt to disagree or act different he would be chastised and discriminated in a manner that was designed to reinforce said perpetrators' preconceived notions and beliefs.

### *14th Amendment*

15. The 14th Amendment of the United States Constitution prohibits the States from depriving "any person of life, liberty, or property without due process of law.
16. The Plaintiff from the onset was deprived of his rights, as shown by the countless shows of malicious obstruction the State of New York and their many municipalities and agencies would engage in and their continuing affirmation that The Plaintiff was wrong and they were right in their actions despite being wrong since The Plaintiff was a child. The Plaintiff would file multiple complaints and litigations outlining and detailing the countless rights & liberties violations The Plaintiff experienced, all which would be ignored and stonewalled under the gauze that he was a mentally unstable and/or retarded immigrant; disenfranchised; and that the State and their municipalities were in the right. The Defendants and the State by extension would use their preconceived fallacies to justify and validate their discrimination and schemes despite it being wrong and invalid and they all knowing it.

### *Conspiracy Against Rights (18 U.S.C §241)*

17. 18 U.S.C §241 makes it unlawful for two more person to conspire to injure, threaten, or intimidate a person in any state from exercising or enjoying any rights or privilege.

1:20-cv- – Yaya Jallow v. – Judge Hon.

18. The Plaintiff would become a victim of a(n) Enterprise(s) that would attempt to felonize and disenfranchise him. The Plaintiff would get unjustly and illegally incarcerated where he would be injured multiple times, 3 broken ribs and a cut to the face to name a few, as part of an intimidation scheme to stop The Plaintiff from being provided equal protection under the law, the 14th Amendment, and invalidate and/or stop any litigations he could bring against said Enterprise (Due Process Clause).
19. The Plaintiff would be overtly and covertly threatened by said Enterprise(s) members from attempting to seek any legal recourse against them through the countless racketeering and illegal acts and actions they would victimize him with.
20. The Plaintiff believes the Enterprise(s) consists of the Shelter Staff and their countless associates &/or friends that work in the New York State & City municipality.
21. The Plaintiff believes all this was done to explicitly disenfranchise The Plaintiff so as to make him in the illegal disenfranchised immigrant they would choose to see him as.

### Federally Protected Activates (18 U.S.C §245)

22. 18 U.S.C §245 makes it a crime to use force or threaten to use force to willfully interfere with a person's participation in a federally protected activities because of race, color, or national origin.
23. The Plaintiff would experience countless. intimidation tactics and threats against him during the course of the events outlined in this complaint. From the direct threat of calling the City of New York Police Department, in an attempt to have the Police murder The Plaintiff, to the willfully slandering and smearing of him to enable and embolden any person into attacking him under the false pretense that he was "rude" and "illegal".
24. The Plaintiff would be depicted as mentally retarded & unstable in a scheme designed to deprive him of being able to bring any litigation against said Enterprise(s).
25. The Plaintiff would experience countless attempts at destitution, with the intended goal of kicking out and stopping him from entering the federally funded New York Shelter System and Housing Authority.

### Fair Housing (42 U.S.C §3631)

26. 18 U.S.C §3631 make is illegal to use force to interfere with housing rights due to victims' race, color, religion, sex, disability, familial status or national origin.
27. The Plaintiff on countless occasions would get treated just like his immigrant mother and like an illegal immigrant or a disenfranchised person in general.
28. The Plaintiff was treated like a misogynist and like a stereotypical ghetto poor black male "nigger".
29. The Plaintiff had on several occasion watch those that have lighter skin than him get access to vouchers and New York City Housing Authority appointments before and at his expense.
30. The Plaintiff would be refused shelter on multiple occasions under the ruse that he was a criminal despite it being due to his race; color; sex; & perceived disability and sexual orientation.
31. The Plaintiff would never be given the opportunity to get housing and on multiple occasions would be refused entry into the City of New York Shelter system.

### Hate Crime (18 U.S.C §249)

32. 18 U.S.C §249 covers crimes committed because of actual or perceived sexual orientation, religion, national origin, gender, gender identity, or disability.
33. The Plaintiff knows every crime he was the unfortunate victim of was due to his perceived nation origin, with most members of said Enterprise(s) assuming The Plaintiff didn't have any rights because he was an illegal or just legal immigrant.
34. The Plaintiff has experienced homophobic discrimination & sexual harassment despite being cis and heterosexual, something the members of said Enterprise would time and time again attempt to disprove and invalidate through their made up ideologues and beliefs.
35. The Plaintiff has experienced sexist discrimination due to him always being treated like a stereotypical black male.
36. The Plaintiff has also on multiple occasions been treated like a female
37. The Plaintiff on multiple occasions has been slandered and smeared by accusations that he was mentally unstable and unsound despite it being false and untrue. The Plaintiff would be provided an attorney from

1:20-cv- – Yaya Jallow v. – Judge Hon.

the mental health unit, something only possible if The Plaintiff had mental health issues, something The Plaintiff has never and will never have

### Racketering (18 Chapter 95)

38. U.S.C 18 Chapter 95 defines an **Enterprise** as any individual, partnership, corporation, association, or other legal entity & any union or group of individuals associated in fact although not a legal entity; and defines a **Racketeering Activity** as any form of: threat, murder, kidnapping, gambling, arson, robbery, bribery, extortion, mail fraud (section 1341), obstruction of justice (section 1503), obstruction of state or local (section 1511), retaliation (section 1513), robbery and/or extortion interference (section 1951), general racketeering (section 1952), & any form of receiving stolen property (section 1957).

39. U.S.C 18 Chapter 95 allows any Plaintiff to recoup 3 times the worth and/or value of whatever was lost, stolen, or damaged due to the activities of said Enterprise and/or Racket and racketeering activities.

40. The Plaintiff would be victimized by several Enterprises that consisted of Shelter Staff and their associates and/or friends that either worked or had authority in the New York State and/or City municipalities. The Plaintiff would also get attempted extorted and victimized by a few Enterprises that predominately consisted of said Municipalities' personnel's associates.

41. The Plaintiff was kidnapped every time he was arrested under fabricated, fraudulent, & false basis.

42. The Plaintiff was threatened directly, indirectly, overtly, & covertly through the course of the events listed in this complaint.

43. The Plaintiff was robbed on multiple occasions of most of his property.

44. The Plaintiff would have his mail stolen on multiple occasions.

45. The Plaintiff would experience countless shows of obstruction on a federal, state, & local level.

46. The Plaintiff was explicitly attempted extorted on one occasion and indirectly extorted through theft & robbery on multiple occasions.

### Amount In Controversy (28 U.S.C §1332)

47. U.S.C 28 §1332 states the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of 75,000$; citizen of different States;

48. In accordance with U.S.C 18 Chapter 95 & 28 Section 1332 The Plaintiff believes the cost and damages listed in this complaint are completely with merit and in line with Federal Statutes.

### V. Parties

49. The Plaintiff, **Yaya Jallow**, (hereinafter "The Plaintiff", "Plaintiff") is an individual who is currently a resident of the State of New York & the City of New York.

50. The Defendants:

   1. The Defendant, **State of New York**, (hereinafter "New York State", "New York", "State of New York") is the legal representative entity of the municipality of the State of New York.

   2. The Defendant, **Letitia James**, (hereinafter "Letitia", "Ms. James", "Miss. James") is the Attorney General of the State of New York and head of all offices and agencies under that agency, ex: Public Integrity Bureau.

   3. The Defendant, **Edward I Geffner**, (hereinafter "Edward", "Mr. Geffner") is the designated agent for Project Renewal Fund, Inc.

   4. The Defendant, **Project Renewal**, (hereinafter "Project Renewal", "PR", "Renewal", "Shelter Staff", "The Shelter") is the legal entity operator for several shelters located through out the City of New York and possibly The Plaintiff's current shelter operator. It's headquarter is located at 200 Varick Street, New York, NY 10014.

   5. The Defendant, **Leticia Randle**, (hereinafter "Leticia", "Ms. Randle", "Miss. Randle", "Program Director") is the program director for the Project Renewal Kenton Hall shelter located at 333 Bowery, New York, NY 10003.

   6. The Defendant, **Robert Lashley**, (hereinafter "Robert", "Mr. Lashley", "Program Director") is the program director for the Project Renewal Third Street shelter located at 8th East 3rd Avenue, New York, NY 10003.

   7. The Defendant, **Yvelyse Marrero**, (hereinafter "Yvelyse", "Ms. Marrero", "Miss. Marrero", "Program Director") is the program director of the Samaritan Daytop Village, Inc Shelter located at 333 Forbell,

1:20-cv- – Yaya Jallow v. – Judge Hon.

Brooklyn, NY 11203.

8. The Defendant, **Samaritan Daytop Village, Inc**, (hereinafter "Forbell", "Forebell", "Samaritan", "Daytop", "The Shelter", "Shelter Staff") is the legal entity operator for several shelters through out the City of New York and operator of the Daytop Village shelter located at 333 Forbell, Brooklyn, NY 11203.

9. The Defendant, **John McDonald**, (hereinafter "John", "Mr. McDonald") is the representative agent for The Doe Fund, Inc.

10. The Defendant, **The Doe Fund, Inc**, (hereinafter "Doe", "Doe Fund", "The Fund") is the legal agent entity for the Rogers Avenue Housing Development Fund Corporation.

11. The Defendant, **Rogers Avenue Housing Development Fund Corporation**, (hereinafter "Rogers", "Rogers Ave", "Rogers Avenue", "Rentor's Associate") is the legal entity operator of the Rogers Avenue Housing Development located at 1355 Rogers Ave, Brooklyn, NY 11210.

12. The Defendant, **Louis A Molina**, (hereinafter "Louis", "Mr. Molina") is the commissioner for the New York City Department of Corrections.

13. The Defendant, **New York City Department of Corrections**, (hereinafter "NY DOC", "DOC", "Corrections", "Department of Corrections") is the legal entity operator of municipality corrections facility throughout the City of New York.

14. The Defendant, **David Terrel**, (hereinafter "David", "Terrel", "Mr. Terrel") is a New York City Department of Corrections Officer with the Badge #4533.

15. The Defendant, **Joshua Maye**, (hereinafter "Joshua", "Maye", "Mr. Maye") is a City of New York Police Department Officer located out the 9th precinct, at the time of occurrence, with the Badge #27006.

16. The Defendant, **Raheen Rivers**, (hereinafter "Raheen", "Mr. Rivers") is a City of New York Police Department Officer located out the 9th precinct, at the time of occurrence, with the Badge #12601.

17. The Defendant, **Lawrence Mckenzie**, (hereinafter "Lawrence", "Mr. Mckenzie", "Shelter Staff") is a Staff member of Samaritan Daytop Village, Inc.

18. The Defendant, **David Bell**, (hereinafter "David", "Mr. Bell") is a Staff member of Samaritan Daytop Village, Inc and possibly one of the perpetrators of a robbery against The Plaintiff if not Defendant Lawrence.

19. The Defendant, **Milton E. Calderon**, (hereinafter "Milton", "Mr. Calderon", "Officer Calderon") is a City of New York Police Department Officer located out the 75th precinct, at the time of occurrence, with the Badge #4165.

### *VI. Allegation of Facts*

51. Facts

1. The Plaintiff would become a victim of an enterprise that would engage in several racketeering activities at The Plaintiff's expense all while having the unfortunate chance of being victimized by a Judiciary, as it would seem, that would conspire to deliberately and intentionally harm, endanger, destitute, disenfranchise, & ultimately murder him while also attempting to portray him as a mentally unstable, retarded, sexists, bigoted, unenfranchised immigrant and when that would fail attempting to felonize him in order to leave him with no prospects and/or options and ultimately forcing him to commit suicide. The Plaintiff would get robbed; retaliated against; attempted intimidated, extorted, & murdered; and become a victim of mail tampering & countless obstructions on a federal, state, & local level. The Plaintiff would experience countless events, actions, & schemes that were designed to stop him from being provided equal & unmitigated protection under the law nor the ability to be housed at a shelter nor any form of housing due to his (as the enterprising perpetrators would willingly and intentionally choose to perceive it) race; sex & sexual orientation; color; perceived national origin and mental disability (with his only form being a stigmatism). The Plaintiff believes this was done because of hatred towards him due to countless threats, intimidation, & harassment he would experienced coming off as racial and sexual discrimination and showing hallmark similarities and properties of Jim Crow and Reconstruction Racism. When all schemes would fail The Plaintiff would have the City of New York Police Department called on him, as part of the Enterprising members intended

1:20-cv- – Yaya Jallow v. – Judge Hon.

goal and shows of force, a pseudo-SWATting attempt that would also portray him as a dangerous clinically unstable retarded black male (classical and time-tested scheme to destitute and disenfranchise him under the ruse that he) who was a danger to himself and the general public at large in what can only be described as a dog whistle to the Police despite it really being due to his race; sex; perceived national origin, sexual orientation, & disability. On the Judiciary's part The Plaintiff would be provided Attorneys & Paralegals, minus a Russ Novak and Anthony Zucco, that obviously harbored malicious motives and intentions of destituting The Plaintiff in what can be only summed up as a non-political witch hunt & violation of the equal protection and due process clauses of the United States' Constitution and, I assume, New York State Constitution.

2. From the very forced first criminal interaction The Plaintiff would have with the New York Unified Court System in the form of a MTA fare evasion entrapment scheme, something that was planned since The Plaintiff was an infant, on May 9th 2019, with it apparently being an annual attempt by said Judiciary & municipality, at large, to murder The Plaintiff, to the countless cases, charges, & warrant The Plaintiff would acquire coincidently since 2021 when he would file federal litigations against said Enterprise(s) & Judiciary. The fare evasion entrapment case would result in The Plaintiff receiving an ACD and getting transferred to Brooklyn as part of an obvious scheme to discredit and hinder him from adequately representing himself under the continuing ruse & gauze that he was mentally unsound and challenged.

3. After being arrested on May 9th 2019 The Plaintiff would file a complaint with the Civilian Complaint Review Board (CCRB) which would get ignored and stonewalled before ultimately getting ruled against him after the CCRB were apparently informed the City of New York Police Department weren't attempting to kill The Plaintiff. The aforementioned judgment would contain a "hidden" message (Exhibit 1) from the CCRB to whoever was suppose to see the judgement besides The Plaintiff to jail him, with it seeming CCRB were "greenlighting" it, in what is clearly an abusive, deliberate, & intentional misuse of "qualified immunity" in schemes that were predicated on using that as the defense. During the course of every investigation The Plaintiff would have his mail withheld, regardless of what shelter he was staying at, in what is a clear-cut validation of said conspiracy & enterprise while also validating a somewhat municipality involvement. The Plaintiff believes this was done as part of a scheme to force him into missing any response deadline in order to validate their preconceived judgements.

4. After suing said municipality of New York in Federal Court The Plaintiff would magically get attacked, coincidentally by a female, and arrested less than a week after filing said litigation (a tactic that said municipality has used time & time again and especially whenever there was "action" on any litigation The Plaintiff has filed or "questionable act/action" (Exhibit 15). The New York Unified Court System, in the face of countless contradicting facts, would actively choose to deliberately and willfully enforce, adjudicate, & sustain racist, illegal, unauthorized, xenophobic, sexist, and prejudicial policies & initiatives towards and against The Plaintiff despite the fact that a supposed Unified Court System of New York's caliber would more than know were and is illegal, unpermitted, & just detrimental towards The Plaintiff and only served to destitute and disenfranchise him in what can only be considered a willful and intentional throwback to Jim Crow and Reconstruction. During the course of a year (2021-2022) The Plaintiff would "magically" amass countless cases, charges, & warrants levied against him despite living 23+ years without any criminal record nor having any actual criminal interactions with Police nor having any interactions with Police beforehand at all since 2005 & just shows the "black nigger" stereotyping these Attorneys, Paralegals, & Justices of the New York Unified Court

1:20-cv- – Yaya Jallow v. – Judge Hon.

System, and by extension general public, willfully and intentionally only choose to see in The Plaintiff and only deciding to hinder, slander, smear, & railroad The Plaintiff all under the ruse of the "Judicial Process". The Plaintiff would be provided with inadequate Attorneys & Paralegals, before being provided Attorneys he knew as a child in what can only be assumed to be pleas of innocence & ignorance, that would never act in his best interest & would just attempt to assist their Judiciary into criminalizing, felonizing, & ultimately murdering and/or suiciding The Plaintiff all while said Judiciary would continually make up excuses for their malicious bigoted actions.

5. As always, the Criminal Enterprise, composed of the New York Shelter System and their personnel as well as their life-long friends and/or associates, would attempt to destitute The Plaintiff through their racketeering & criminal schemes and activities that were designed to place him in a position where his only choice was to be a victim of their hatred and disenfranchisement and/or killing himself.

6. During sometime in November 2022 The Plaintiff would get transferred from the Salvation Army Shelter (located at 681 Albany Ave, Brooklyn, NY 11213), where he was a victim of countless hate crimes & obstructions, to Project Renewal's Kenton Hall shelter (located at 333 Bowery, New York, NY 10003 and under the program supervision of Leticia Randle). Over the course of the following 4 months The Plaintiff would experience the same racketeering activities that he experienced at all other shelters as well as an overall Civil Rights violation/victimization campaign. The Staff at Kenton Hall would display a lack of care and respect, all while treating The Plaintiff like his immigrant mother, that was on full display when a Client that has been known by The Shelter Staff for at least 20+ years, with all parties involved having met both The Plaintiff and his mother in The Plaintiff's youth, pulled a knife on him, in a blatant robbery attempt and insult. When The Plaintiff would inform The Shelter Staff of this attempted knife robbery attempt & would ask for a bed change, to deescalate & defuse the situation, he would be refused and instead The Shelter Staff would act like nothing occurred and choosing to instead reward their friend and/or associate for the attempted knife robbery.

7. As a major component of their destitution campaign The Shelter Staff would continually attempt to cost The Plaintiff his job, something they have been doing since his infant years. This would be accomplished by refusing to provide The Plaintiff with an overnight pass, for his late night jobs, in what can only be described as a scheme to force him into choosing between working & not having a bed or having a bed & living in destitution and also acting as a foil to "legitimize" The Shelter Staff's robbery of The Plaintiff, a clear-cut example of a criminal enterprise. While staying at Kenton Hall and being aware of the direct connection between the Staff and the Judiciary The Plaintiff would begin reporting the corruption he was experiencing. The Plaintiff would send a complaint to the New York State Commission on Judicial Conduct on April 8th 2022, which would just be used a legal basis to imprison The Plaintiff.

8. During the week of April 24th – 30th 2022 The Plaintiff would have a hair appointment, to just get his hair re-dreaded after cutting them in 2019 due to a physical assault in Seattle, with one of Kenton Hall's Staff's non-platonic female friends he met while staying at the Salvation Army Shelter. The Plaintiff would get accosted & egged on that Sunday night, April 24th 2022, into a possible physical altercation with said Staff member but due to a desire to defuse the situation, due to the known idiocrasy of the whole situation, The Plaintiff would end up punching a door's glass window instead of the Staff's face, as the cowardice pussy Staff had schemed. The Shelter Staff would then call the City of New York Police Department after repeatedly attempting to remove The Plaintiff's bed, who would reluctantly respond sometime later and end up taking The Plaintiff to the hospital for the

1:20-cv- – Yaya Jallow v. – Judge Hon.

cuts on his hand.

9. After returning from the hospital The Plaintiff would return to The Shelter and provide his discharge papers, a tactic used by the Shelter Staff to allow them to make false statements about his visits to the hospital as part of their larger scheme to smear and slander him by allowing them to make untrue statements about The Plaintiff's visits while allowing them to claim ignorance.

10. Due to the hostile and malicious atmosphere of the shelter The Plaintiff would end up spending the night of April 26th 2022 at a co-worker's offspring's friend's apartment and would return to the shelter the following day to be informed that his bed had been taken, despite it not occurring when he went to the hospital and that his belongings had been packed up due to him being transferred to the shelter located around the corner, also ran by Project Renewal, called Third Street Shelter (located at 8 East 3rd Avenue, New York, NY 10003 and under the program supervision of Robert Lashley) & would be provided his belongings to move himself around the corner despite the buildings being connected. Once The Plaintiff would receive his belongings he would only receive his laundry bag and not his explicitly locked backpack full of electronics (which contained a Nintendo Switch, several accessories, controllers, & several games; laptop, secondary cellphone; & several usb flash drives). When he would ask about his bag of electronics he would be informed that "in-house" policy regarding electronics, something that shouldn't be possible due to the backpack being locked with a padlock, meant that his bag was on the third floor and that he would have to wait until the following Tuesday, 6 days away, before he would be able to retrieve them. Giving them benefits of the doubt (possibly hoping that it would end up in the hands of actually needy children that would enjoy or use them, if he was wrong) due to explicitly knowing The Staff, The Plaintiff would go along with the ruse and planned to return Tuesday to possibly retrieve his electronics but due to the actions of said Criminal Enterprise that wouldn't happen.

11. The Plaintiff would grab his clothes bag along with his suitcase and move around the corner to the Third Street Shelter, a deliberate form of emotional torment.

12. The Plaintiff would spend the following day, the 27th of April 2022, getting settled in.

13. On April 28th 2022 The Plaintiff would go downstairs to retrieve a soda from the vending machine located in the cafeteria on the ground floor. Once the elevator arrived on the ground floor The Plaintiff would come face to face with several City of New York Police Department Officers standing at the entrance to the shelter. Due to an uneasy and common, as it pertains to The Plaintiff, feeling he would get at the sight of the Officers The Plaintiff would make eye contact with said Officers & stand around for a while to see if the Officers were there for him. After waiting a fair amount of time and nothing happening or being said to him, The Plaintiff would go about his business and would go to the vending machine to retrieve his soda and return back upstairs. After laying in bed and realizing that he was located next to an outlet but not directly underneath it The Plaintiff would decide that he required an extension cord as well as new bandages for his cuts. The Plaintiff would decide to go to the nearest department store to purchase said items. After searching Google Maps and locating Rite-Aid, he would head that way. After purchasing the extension cord & bandages The Plaintiff would be in a walking mood, due to a desire to not be around people he has never liked nor can stand since he was an infant, and decide to walk the long way round before returning to The Shelter. Unbeknown to The Plaintiff he would take a left turn upon exiting Rite-Aid and end up walking pass the 9th precinct (located at 321 E 5th Street, New York, NY 10003). While walking pass the 9th precinct The Plaintiff would get called for by, being unknown by The Plaintiff at the time, the same Officers that were standing at the doorway of The Shelter when he was getting his soda. After responding to the Officers

1:20-cv- – Yaya Jallow v. – Judge Hon.

which if memory serves had told him in his youth to keep walking, due to being a law-respecting citizen and after a quick chat amongst themselves, which The Plaintiff vaguely remembers, The Plaintiff would be placed under arrest by Officer Joshua Maye (Badge #27006) & Officer Raheen Rivers (Badge #12601) for breaking the window at the shelter a couple of days prior with The Plaintiff believing he was transferred to facilitate the arrest and due to the arresting Officer, being of Asian descent, placing The Plaintiff under arrest at the discretion of his fellow African American partnering Officer in what can be assumed to be an allusion to back when The Plaintiff was an infant and hanging out with those exact same Officers and everybody around him wanting to believe he thought he was Asian and not "black" due to a contractual agreement he had as a child, something that would recommend a simple and obvious resolution for said actions. The Plaintiff believes this was the start of said Enterprise choosing to treat and depict The Plaintiff explicitly as a "criminal nigger", with the arrest allowing said Enterprise the ability to "legitimize" their discrimination and disenfranchisement of The Plaintiff under the ruse that it was due to his "criminal status" when it never was, which can be verified by the fact that The Plaintiff was treated in the exact same manner since before he had any form of "criminal record" and despite The Enterprise's best attempts at pretending he ever did. The Plaintiff wouldn't even be read his Miranda Rights, further proof of the known nature of the arrest and by all definition a form of kidnapping, since the very moment he was placed under arrest.

14. The Officers would hold The Plaintiff for several hours at the 9th precinct, with The Plaintiff being arrested around 5pm but not even being able to see a Judge until around midnight as always, as they always do & attempting to destitute The Plaintiff due to "late court appointments". The Plaintiff would the finally get transferred to Manhattan Central Booking around 7-8pm where he would get accosted, harassed, intimidated, and entrapped in what is a clear-cut cover and front for the racketeering robbery that said Officers & their Shelter Staff associates &/or friends where engineering since the start. The Plaintiff would get accosted by an inmate who would provoke a fight & in response New York Department of Corrections Officer David Terrel (Badge #4533) would amass a group consisting of him and 4 fellow Officers and would force The Plaintiff into fighting them after repeatedly initiating & ignoring several refusals by The Plaintiff to not fight them in what The Plaintiff understood as a direct and deliberate insulative comparison of The Plaintiff to his faggot cousin. The Plaintiff would fight those 5 Officers and in response to getting his ass beat Officer Terrel would respond by slamming The Plaintiff & breaking 3 of his ribs & applying his whole-body weight on The Plaintiff, in a clear-cut murder attempt just like George Floyd. Afterwards The Plaintiff would get charged with the trumped up charges of assaulting a Peace Officer despite it being a consenting fight that was initiated by the charging party, in what was apparent a scheme to felonize The Plaintiff so to allow said Enterprise to continue their destitution & disenfranchisement campaign all under the "legal" gauze of him being a felon.

15. After getting his Judge appearance pushed back due to the new charges The Plaintiff would finally go before the Judge almost a whole day after getting arrested and due to the new charges levied against him and in combination with a missed April 13th 2022 court date, as the Judge would explicitly state in The Plaintiff's face and despite him missing it due to his public appointed Attorney which just further proves the corrupt and conspiring nature of said Judiciary.  The Judge would use those two conditions as grounds and basis for sending The Plaintiff to Riker's in what is clearly a ploy by said Judiciary to force Judicial reform, something The Plaintiff would love to return the favour of, despite it not being the proper nor adequate manner to go about such intentions.

16. Over the course of the following 36 days The Plaintiff would be housed on Riker's Island

1:20-cv- – Yaya Jallow v. – Judge Hon.

where The Plaintiff would become a victim of the continuation of the Corrections' Officers deliberate and intentional endangerment & murder schemes & tactic all while portraying him as the aggressor and perpetrators. The Corrections Officers would on multiple occasions place The Plaintiff in hazardous situations and with deliberately known adversaries all while acting like they knew nothing at all of what was occurring.

17. The Plaintiff would go to Court for his plea deal, which was explicitly stated would adjudicate & close all open and active cases against him at the time of the signing of said plea deal, which was really just a scheme to felonize The Plaintiff & place the blame in his court. After returning from Court The Plaintiff would return to have his mattress stolen and despite it being standard jail policy and procedure to hold all 3 meals for any inmate at Court there would be no food saved for The Plaintiff, in what was a clear attempt to starve and murder The Plaintiff just like Jordan Neely. Despite being expected to sleep on a cold bedframe or die The Plaintiff would head to the most likely culprit, an inmate that had 3 mattresses despite spending the preceding night sleeping on the floor and only having 1, & take back his mattress which would lead to a fight due to said inmate's believe that anyone was dealing with his shit. After fighting, The Plaintiff would be removed from the dorm while other inmates went through his belongings, despite repeatedly asking Corrections Officers to retrieve his belongings, & portrayed as the aggressor and the villain and would get transferred to a dorm without adequate clothing and/or blankets that was perpetually freezing, in an attempt to freeze him to death, all while still not being provided any food. During breakfast The Plaintiff would ask & receive extra milk but would get into a fight after said breakfast aide, who provided him with the milk, would steal the milk and an extra one after The Plaintiff got up to give another inmate an orange. This theft would lead to a fight between the aide, his 2-3 friends, and The Plaintiff, with this being the plan since The Plaintiff was a child as was explicitly told by the very same inmates to The Plaintiff's face when he was a child. During this jumping The Plaintiff would get his face cut by a shank, as The Plaintiff would explicitly feel, which apparently the Corrections Officers allowed into the dorms and do absolutely nothing about & even going so far as to claim the cut on The Plaintiff's face was due to a "closed-fist laceration", despite The Plaintiff's assertions and feeling when a blade cut his skin. The Corrections Officers would time and time again continue this tactic in order to protect their inmates while continuing to endanger & portray The Plaintiff as the aggressor, in a clear-cut scheme to portray The Plaintiff as a violent felon that is a trouble maker. The Plaintiff would then get transferred to another dorm where his property, which contained copies of his filled out inmate grievance forms as well as vital important documents, was "magically" stolen in the 3-5 minutes he chose to watch the Celtics playoffs while supposedly The Corrections Officers watched with The Plaintiff knowing this was the intended and desired goal due to The Plaintiff knowing all the Correction Officers he met and the association between them & their inmates. Afterwards The Plaintiff would get transferred to another dorm where his "associate" would get jumped by the whole dorm for inquiring about his stolen food while the Correction Officers was out getting ice for the inmates at their request, as a favour to the inmates. During the course of all these events The Plaintiff would file multiple Inmate Grievance Forms, all which were either inadequately addressed or would receive a mute or moot response and would just lead to more retribution towards The Plaintiff (with the property theft being a direct consequence for said reportings).

18. On June 3rd 2022 around the hours of 5-6am, after being held for a pre-release background clearance check, The Plaintiff would get released from Riker's Island. Immediately after getting released The Plaintiff would make his way back to the 9th precinct to obtain his vouched property. Once arriving there The Plaintiff would be asked to provide an ID, which

1:20-cv- – Yaya Jallow v. – Judge Hon.

had been vouched with his belongings when he was arrested, & would instead provide his first and last name along with his date of birth and asked to sit in the waiting area. While The Plaintiff sat and waited he would notice, as it appeared, several High-Ranking Officers begin to leave the station-house. After a couple minutes of waiting The Plaintiff would be approached by several Officers that would inform him that he had a warrant, despite being on Riker's for the last 36 days & having his background checked at least a minimum of 4-5 times. The warrant would turn out to be an I-Card hold out of the 78th precinct for questioning (Warrant #1202201866) which was filed on April 14th 2022, the day after The Plaintiff's missed court date. Despite documentation stating the warrant was filled on April 14th 2022, the warrant would never show up or get mentioned when The Plaintiff was arrested on April 28th 2022; the hours he was held at the 9th precinct; the several court dates he attended; nor the pre-release Riker's clearance background check; and in the face of the plea deal agreement but would somehow magically manifest in the 2 hour window it would take The Plaintiff to travel from Queens to the Lower East Side where the 9th precinct was located. Due to the occurrence of said computer technical issue happening countless times between The Plaintiff & The New York Unified Court System it would be safe to assume that said technically issue was a deliberate & intentional tactic used by the New York Unified Court System to "criminalize" The Plaintiff into having an active warrant & as such causing him not to be able to do anything that would require a background check as well as allowing the City of New York Police Department to arrest The Plaintiff whenever they would like in an attempt to inconvenience & treat The Plaintiff as a criminal nigger.

19. Despite the warrant being filed on April 14th 2022 the person who filed the warrant wouldn't feel a need to locate or interview The Plaintiff during his 36 days hold on Riker's.

20. During the June 3rd 2022 arrest The Plaintiff would be arrested by an unknown Officer, as it pertains to identification, who would take The Plaintiff to the back-holding cell area while informing him that they were waiting on the person who filed the warrant to come pick him up, something that would take 4 hours to happen, around 12pm. During this time The Plaintiff would ask to receive his property to which The Officer at the desk would reply that it would require too much paperwork, which just seemed like an allusion to this litigation and the property theft their associates at the Shelter committed against him and would keep with the known knowledge that said Officers would vouch for their characters and protect their backs.

21. While in the back holding cell area the arresting Officer would check The Plaintiff's shoes and clear him to be placed in the cell when all of a sudden Supervising Officer Berries (Badge #1128) would walk into the room and command for The Plaintiff not to be placed in the cell, a supposedly kind hearted gestures, show, & allusion that was overridden by The Plaintiff's name calling of said Officers, & instead to sit down, a possible electrocution and/or political reference. Due to being referenced back to his arresting Officer whenever he would ask a question The Plaintiff would return the favour and likewise not answer any question he was asked and would only respond to and acknowledge his arresting Officer to which Supervising Officer Berries would proceed to place his hands on The Plaintiff's chest and use excessive force to force him into sitting down. Officer Berries would then proceed to tell The Plaintiff to remove his shoes again, in what The Plaintiff assumes was to get at the documentation he had placed in his sock. Afterwards The Plaintiff would attempt to place The Plaintiff in the cell with handcuffs on, in a possible attempt to have his informant attack & possibly kill The Plaintiff, as was explicitly planned and stated to The Plaintiff's face when he was a child & was hanging out in the same precinct hence the arrogance of said Officers to think they could conspire against The Plaintiff. Officer Berries would use his position to attempt to escalate the situation after having his feelings hurt due to being

1:20-cv- – Yaya Jallow v. – Judge Hon.

called a nigger by using unneeded excessive force as well as deliberate intimidation scare tactics & just act all around unprofessional.

22. After being held at the 78th precinct for an additional 8 hours The Plaintiff would go before the Judge and get released around 12-1am on June 4th 2022, another attempt to destitute The Plaintiff when he would be brought before the Judge, despite being offered a plea deal that explicitly stated all cases against him would be closed and adjudicated, he would be informed that there was still a "magically" SAP warrant (a moronic dog whistle designed to hut and offended The Plaintiff by an apparent faggot ass city that thinks anyone would care and child mentality having Judiciary) against him and now he had 2 open cases against him despite none of them holding any water. The Plaintiff would be provided a July 22nd 2022 court date for the I-Card warrant and was told that a later date would be set, after a Court Officer would attempt to inform the Judge to cut the crap but said Judge would feel it was in his authority to keep up the nonsense. Due to the timing and parties involved it would seem the intent was to force The Plaintiff into getting released at night so he wouldn't be able to receive a bed and would have no other option besides sleeping outside in destitution due to The Plaintiff having no other possible or un-malicious or unmoronic options nor person(s) to stay with in the City of New York, a known fact by said Judiciary hence their conspiring nature.

23. After finally getting released a second time The Plaintiff would return to the 9th precinct to obtain his property but would be told this time that his property was located at 1 Police Plaza, which was closed due to the secondary arrest and would be open at 8am on Monday June 6th 2022. This would basically leave The Plaintiff stranded in the streets without any of his personal essential belongings (cellphone, wallet, or clothes & being forced to walk around the City of New York in prison scrubs in a scheme to invalidate a jury and emotional harass The Plaintiff) which in turn would have left him with no other option but to sleep on the streets and get killed, something that was the intended goal & desire. The Officers at first would attempt to not be able to locate his vouched property due to being unable to provide a voucher number, which was stolen on Riker's, and instead would magically find one when he provided his arrest number.

24. After dealing with the Police's nonsense The Plaintiff would walk the several blocks back to the Shelter. Once The Plaintiff would arrive at the shelter & attempt to obtain a bed he would be informed that he wasn't in their system due to not being there for over a month and would have to return to the HRA Intake Center to get assigned to a shelter, a deliberate & intentional scheme designed to get The Plaintiff arrested when he would attempt to get on the train without a MTA metro card due to The Shelter Staff refusing to provide him with one. The Plaintiff would ask for his belongings, which at that point consisted of his laundry bag & electronic, which The Plaintiff would receive a response of that due to him being gone longer than a week was thrown out, further proof & evidence of the criminal enterprise.

25. After going to the HRA Intake Center The Plaintiff would explicitly be informed that his placement was still the same, Third Street, & that he wouldn't get any new placement & would have to return back to Third Street.

26. The Plaintiff would return to Third Street and get assigned a bed while still never receiving his property.

27. After being forced to buy a new phone replacement The Plaintiff would gain access to his voicemail and would discover a voicemail from Attorney Russ Novack stating he had contacted the shelter & they would hold his belongings until he returned to the Shelter (Exhibit 7), something that was a lie due to him never receiving his property no matter how many times he would ask.

1:20-cv- – Yaya Jallow v. – Judge Hon.

28. On June 4th 2022 The Plaintiff would file a complaint with Project Renewal detail his property theft by the Shelter Staff (Exhibit 5).

29. Once The Plaintiff was able to get in contact with his attorney Anthony Zucco, a person The Plaintiff met as a child and was consistently mocked about how he would grow up to want to be him and have his lifestyle and probably wasn't involved in said conspiracy, around June 5th 2022 and asked about the Court Date for the SAP warrant he would be informed that it was assigned to July 2nd 5000, which if memory serves correctly was a job placement whistle. When The Plaintiff would inquire further how the court date could be so far in the future, an incorrect dog whistle that The Plaintiff was aware most wouldn't be aware of, and whether the New York Unified Court System had a computer issue his attorney would respond that it was probably a clerical error, probably due to an exhausted parent worker. To be on the safe side The Plaintiff would assume July 2nd was the actual court date and when that date came it would turn out to be a Saturday, which saw the Courts closed. The Plaintiff would instead go to the courthouse on the following business day, July 5th 2022, and when he would ask about the SAP Warrant Court Date he would be informed that it was actually on June 7th 2022, which was the following Tuesday after he was released, but which wasn't mentioned by his attorney when he asked, either due to him not knowing or the court date getting switched. The Plaintiff believes the bench warrant was issued to enable and allow the City of New York Police Department to arrest him under dubious, inaccurate, sacrilegious, & false pretenses and circumstances while presenting their Officers with the possibility of accidently killing The Plaintiff as has happened countless times in the City of New York all under the gauze of an "accident". Despite having the bench warrant issued and having multiple interactions with The Police where his ID was ran since the apparent issuance of said warrant, a tactic used to force The Plaintiff into acting like a criminal fugitive and not being able to access any form of resources dependent on a background check or identification check which is just a form of destitute, The Plaintiff wouldn't be apprehended nor notified of its existence.

30. On June 6th 2022 The Plaintiff would file a complaint with the City of New York Police department internal affairs bureau detailing his June 3rd 2020.

31. On June 6th 2022 The Plaintiff would gain employment and would end up returning to The Shelter around 4am for a period of 8 days where The Plaintiff was provided a bed roll to sign and then would proceed upstairs to his assigned bed.

32. On June 7th 2022 The Plaintiff would file a complaint with the Civilian Complaint Review Board about his June 3rd 2022 arrest.

33. On June 7th 2022 The Plaintiff would file a report about the Third Street Shelter property theft with the New York State Office of Temporary and Disability Assistance.

34. On June 8th 2022 The Plaintiff would receive a response from the New York State Office of Temporary and Disability Assistance from a Mr. Raymond Wright, a person The Plaintiff probably knew as a child that would genuinely attempt to assist The Plaintiff but as always was unaware of the Criminal Enterprise the Shelter System was operating.

35. On June 13th 2022 The Plaintiff would have a meeting with his Case Manager but had lost the paper detaining the information and would head downstairs to inquire with The Shelter Staff about it but would be told by said Shelter Staff that they couldn't access their system to retrieve the information and would instead attempt to phone the Case Managers but would have the call end up at their voicemail. After pressing a little bit, The Plaintiff would be provided a meeting two days later, if memory serves correctly. When The Plaintiff would finally meet with his Case Manager he would inform her of his multiple jobs, hence the 4am arrivals, and requirement of an overnight bed pass as well as inquiring about his stolen property. When The Plaintiff would leave the meeting, even explicitly informing her that he

1:20-cv- – Yaya Jallow v. – Judge Hon.

was leaving to go directly to work, he was under the explicit impression and notion that his overnight pass had been placed and approved. The Case Manager would even ask The Plaintiff for his phone number, under the implied reasoning that she would contact him if need be about anything pertaining to his case and him.

36. On June 14th 2022 The Plaintiff would receive a response from an investigator Coleson Smith pertaining to his complaint he filled about his June 3rd 2022 arrest.

37. During the evening of June 14th 2022, morning of June 15th 2022, The Plaintiff would arrive at The Shelter at the same time, 4am, he had for the last previous 8 days and despite explicitly being told he had an overnight pass he would be informed his bed was taken for missing curfew and that he would have to sit/sleep downstairs while he waited for a bed, another theft attempt under the gauze of their 7-day property retention policy. The Plaintiff would ignore such request and would go upstairs to find his belongings had been packed up and would have the City of New York Police Department Officers called on him, who despite being fully aware of what was occurring would act obvious and once again keep attempting to force The Plaintiff to kiss their ass to receive any form of service let alone the proper service they should be rendering him. The Plaintiff would spend the next 3 days returning to the Third Street Shelter and being forced to sit and sleep downstairs, causing back and body plain & harm, and being forced to wait while The Shelter Staff explicitly stated they were looking for a bed, even stating he was in their system when he would ask, in what was an obvious scheme to enrage The Plaintiff into attacking them so they could get him arrested and validate their secondary theft.

38. On June 15th 2022 The Plaintiff would report the secondary theft attempt by Project Renewal's Third Street Shelter Staff to the New York City Department of Homeless Services Office of Ombudsman.

39. In the morning of June 15th 2022 The Plaintiff would go to the New York City Department of Homeless Services new building and would speak with DHS Staff, who would also seem to be complicity in the Shelter Staff's schemes due to their unrelenting desire to side, not condone, & validate The Shelter Staff and their actions and even going so far as to explicitly state they didn't care about what The Plaintiff was forced to endure as well as intentionally and deliberately lying to The Plaintiff's face about Shelter Transfer Protocols (Exhibit 8) and when he would call them out for lying they would call their Security personnel on him and even threaten to call the City of New York Police Department on him, an obvious racial dog whistle regardless of said personnel sharing the same race as The Plaintiff. The DHS personnel would refuse The Plaintiff's transfer request and would tell him his assigned shelter was Third Street and regardless of the fact that The Staff was attempting to starve and murder him they wouldn't transfer him.

40. On June 15th 2022 The Plaintiff would send a Complaint Status check email to the United States Department of Justice, checking up on the status of his countless complaints.

41. On June 18th 2022 The Plaintiff would go back to the Department of Homeless Services and watched as said personnel would call the Third Street Shelter Program Director and inquire about The Plaintiff. The Shelter Staff would state they had placed in a transfer for The Plaintiff a couple days prior and that he should be getting transferred in a couple of days. The Plaintiff would then leave and head to work. After work The Plaintiff would head to the HRA Intake Center and be informed that he was removed out the whole DHS Shelter System, a criminal and illegal act, on June 14th 2022 in the face of the countless lies stating he had been assigned a shelter and a transfer was in place. The Plaintiff believes this was done in "compliance" with their in-house 7-day property retention policy to enrage him and allow The Shelter Staff to steal The Plaintiff's remaining property and belongings under the ruse that he wasn't there for the last 8 days despite being present and in the building,

1:20-cv- – Yaya Jallow v. – Judge Hon.

another racial dog whistle, in a scheme designed to enrage The Plaintiff into attacking the Shelter Staff so they could further treat him like a criminal nigger. This would be the 3rd – 4th time this scheme has been deployed on The Plaintiff in the New York Shelter System and just shows the complicity, intent, and elements of a criminal enterprise. The Plaintiff would eventually get a text message from the DHS representative, in a form of genuine help, detailing that he had been transferred to the Samaritan Daytop Village Shelter located at 333 Forbell Street, Brooklyn, NY 11203 which is under the program supervision of Yvelyse Marrero.

42. During the course of the aforementioned events The Plaintiff would time and time again report all the events and actions he was the unfortunate victim of to countless agencies and departments throughout the New York State & City municipality that were responsible for handling such complaints such as: the New York State Attorney's Public Integrity Bureau, the New York Department of Social Services, the New York State Office of Temporary and Disability Assistance, the Southern District of New York, and countless others. A vast majority if not all of The Plaintiff's complaints would get ignored and brushed off in what was just an emboldening & enabling act and possible greenlighting of said Criminal Enterprise(s) to continue their schemes, tactics, & plans while even elevating their malice and hatred.

43. After dealing with the deliberate & intentional overt & covert racism; bigotry; and hatred from the personnel of the New York Shelter System The Plaintiff would end up renting a room in an apartment (located at 1427 Flatbush Avenue, Brooklyn, NY 11210) from June 2022 – April 2023. During those 10 months The Plaintiff would still experience a continuation of the same discriminatory treatment as well as victimization by a, if not the exact same, criminal enterprise which would just further prove if not validate the involvement or existence of a municipality policy to destitute and disenfranchise The Plaintiff.

44. During the Summer of 2022 The Plaintiff would report the misconducts and muted responses he received to the New York State Commission on Judicial Conduct.

45. In June 2022 The Plaintiff would open another bank account with Axos Bank, due to the hostile and questionable treatment he had experienced from his bank during the month of January – February 2022. After opening his bank account online and providing a copy of his Massachusetts State ID The Plaintiff would go onward to deposit money over the course of a month, around 220$, into his new accounts (consisting of a checking, savings, and investment account) only to have a withdrawal/deposit hold placed on his accounts during the end of July 2022. When The Plaintiff would inquire he would be told it was because he didn't provide adequate or enough identification, in accordance with Federal Statutes which The Plaintiff knew was nonsense on it's face and reasoning, to meet the requirements to maintain the account. Over the course of the next couple months The Plaintiff would attempt to provide enough documentations but due to just renting a room couldn't prove the residence/utility bill requirements, a dog whistle about The Plaintiff's perceived immigration status despite being a born US Citizens Winner, and would end up having to contact his main bank, Ally Bank, to initiate a reverse-transfer, which would also attempted to be blocked and stopped as a possible forerunner for the First Republic crash and 2023 bank failures. Despite eventually getting the reverse-transfers to work The Plaintiff would still be missing 20$ when he would eventually receive a mailed, which was also attempted to be stolen, check (Exhibit 10) containing the supposable remaining balance in his account.

46. On July 14th 2022 The Plaintiff would send a complaint outlining all that he was experiencing to the New York State Attorney's Public Integrity Bureau, the New York State Commission on Judicial Conduct, the New York Court Office of Managing Inspector

1:20-cv- – Yaya Jallow v. – Judge Hon.

General for Bias Matters, and the United States Department of Justice.

47. On July 18th 2022 The Plaintiff would report the Petty Larceny & Criminal Enterprise he was the victim of to the New York State Attorney's Public Integrity Bureau.

48. On August 8th 2022 The Plaintiff would send a complaint to the New York State Department of Finance inquiring about this withheld 2019 State Tax Refund, something that he has still yet to receive (even at the time of writing in May 2023) and had no ground nor basis for being withheld due to The Plaintiff never once using any form of public assistance nor money during his whole April – September 2018 stay in the City of New York nor breaking any laws or committing any crimes and leaving in September 2018 when he placed money on his MTA metro card which was never credited and when he would inquire with the booth agent about it, was told to suck it up or send a detailed complaint to Albany and wait several months to receive a response.

49. On September 30th 2022 The Plaintiff would become a victim of mail tampering when his Axos mail and several other mails would never be delivered to him despite being informed they had ben delivered.

50. On September 30th 2022 The Plaintiff would send a complaint detailing his mail tampering theft to the United States Postal Service Oversight Board.

51. On October 5th 2022 The Plaintiff would become a victim of mail tampering again when his mail containing his Cash App bank card would get stolen. The Plaintiff would check the USPS online mail tracker and it would state that his mail was delivered and that it had been picked up in person from the Nostrand USPS post office which was located at 2319 Nostrand Avenue, Brooklyn, NY 11210. Despite The Plaintiff being on the train headed to work at The Ribbon around the hours of 5pm when it was stolen, The Plaintiff has never and did not provide anyone, ever, with permission or authority to pick up or receive his mail. The Plaintiff would file another Complaint with the United States Postal Service Oversight Board (Exhibit 14) which would get ignored but would eventually have The Plaintiff receive his stolen mail in November 2022 from his Rentor

52. On October 6th 2022 The Plaintiff would see litigation action on a claim, about being blackballed and discriminated in the New York Restaurant Industry, he filed in the New York Court of Claims (Exhibit 15).

53. On October 12th 2022 The Plaintiff would report the Axos Bank theft (fraud) attempt to the United States Federal Reserve (Exhibit 9).

54. On October 14th 2022 The Plaintiff would receive a respond from the New York State Commission of Judicial Conduct (Exhibit 12).

55. On October 14th 2022 The Plaintiff would report the New York Unified Court System's corruption to the United States Department of Justice Office of Special Counsel.

56. Towards the end of October 2022, The Plaintiff would gain employment at The Ribbon (located at 20 W 72nd Street, New York, NY 10023 and consisting of people he knew and met as an infant) where he would experience willful and intentional racial discrimination by several junior employees, and supposedly "old friends". When The Plaintiff would inquire about receiving payment for the work he had performed he would be fired on the spot but under the excuse that he was insubordinate, a racial dog whistle alluding back to when The Plaintiff was an infant hanging out with the exact same people and was being racially mocked and lied against which was the basis for said employees believing they could use said excuses due to it being the acceptabed reason their conspiracy came up with. The Plaintiff would then go onwards to get blackballed out of the New York Restaurant Industry, a clear and intended message, by having all his job prospect dry up as compared to before he filed his complaint and in general as compared to the last 4 years he had worked in New York City.

1:20-cv- – Yaya Jallow v. – Judge Hon.

57. On October 30th 2022 The Plaintiff would apply for Unemployment Insurance, as the unemployment benefits is called in the State of New York. The Plaintiff would get denied the first several times he would apply (Exhibit 20) and several occasions when he would gain employment but would be fired before he would receive payment (Exhibit 22), in what seemed like a scheme to starve The Plaintiff out and have him die like Jordan Neely. When The Plaintiff would finally get approved he would still be required to do a in-person/cell verification (Exhibit 19), something that runs counter to the General Public's desire to treat The Plaintiff as if he was a known celebrity. The Plaintiff would then go onward to apply for SNAP/EBT benefits which were also denied and refused.

58. On November 12th 2022 The Plaintiff would file a worker discrimination complaint against The Ribbon with the New York State Department of Labor (Exhibit 16).

59. On November 13th 2022 The Plaintiff would finally have his unemployment insurance (Exhibit 20) approved but would miss the first two weeks he claimed and end up owing 2 months back-rent which at 400$ rent would saw him not be able to adequate support himself from the 304$ he was being supplied.

60. On November 13th 2022 The Plaintiff would file a complaint detailing the overall corruption he was experiencing in the City of New York to the United States Department of Justice Office of Special Counsel.

61. On November 28th 2022 The Plaintiff would experience the same discriminatory treatment he received as always when he would go to the HRA Brooklyn Office (located at 275 Bergen Street, 1st Floor, Brooklyn, NY 11217) and be refused adequate service and would once again get accosted in a scheme to call the City of New York Police Department on him and get him banned from the Office in an attempt to refuse him from receiving benefits (Exhibit 17).

62. On December 5th 2022 The Plaintiff would report The Ribbon to the United States Equal Employment Opportunity Commission (Exhibit 23) after the New York State Department of Labor would continue their favoritism and corruption.

63. On December 19th 2022 The Plaintiff would report all the lackluster Federal Responses, all choosing to deliberately and intentionally ignore The Plaintiff's complaints under their personal choices of being losers, to the United States Governmental Accountability Office (Exhibit 28).

64. On January 6th 2023 The Plaintiff would report a 2nd fraudulent charge against his Robinhood Brokerage Account, with the first occurring in September 2022 while The Plaintiff was in Georgia for his Sister's Birthday.

65. On January 30th 2023 The Plaintiff would get his SNAP application refused for a 3rd time.

66. On January 31st 2023 The Plaintiff would experience a racial service refusal during his visit to a Smoke Shop (Exhibit 25).

67. On February 1st 2023 The Plaintiff would move from renting a room at Flatbush Avenue to a room on Rogers Avenue (located at 1355 Rogers Avenue, Brookly, NY 11210 and operated by the Rogers Avenue Housing Development Fund Corporation which is operated in conjunction with The Doe Fund, Inc) as part of a verbal transfer agreement between his Flatbush Avenue Rentor in conjunction with the Rentor's friend and/or associate.

68. While staying at Rogers Avenue The Plaintiff would become a victim of an attempted extortion attempt, in what was either a continuation of the previous or a whole new Criminal Enterprise, that would start with The Plaintiff being refused access to use the kitchen, around the same time he was refused SNAP benefits for a 3rd time in a possible allusion to his restaurant industry blackballing and SNAP refusal, and would escalate to The Plaintiff having a knife pulled on him when he would refuse to be starved in what was possibly another extortion attempt. The racketeering activities would cumulate in an attempt on April 1st 2023 to steal from The Plaintiff by going against the verbal agreements he had and attempting to surprising kicking him out, hoping he would leave his

1:20-cv- – Yaya Jallow v. – Judge Hon.

property behind and as such invalidate the robbery aspect of their actions, and when that would fail possibly hoping he wouldn't leave so they could once again call the City of New York Police Department on him in another attempt to SWAT him.

69. Due to the stranding nature of the Roger Avenue events and only having 2 weeks left before his planned move back to Atlanta, Georgia The Plaintiff would bite the bullet and return to the last shelter he was assigned, Samaritan Daytop Village Shelter.

70. During the 8 days The Plaintiff would spend at Samaritan he would experience a continuation of the same racketeering tactics he has always experienced at every shelter he has stayed at and which would cumulate in another murder attempt and robbery, with either misguided or misinformed assistance from the City of New York Police Department.

71. On April 9th 2023, a year and day after The Plaintiff would file his initial corruption complaint with the New York State Commission on Judicial Conduct, around the hours of 12-1pm The Plaintiff would decide to do his laundry with the intent of having clean clothes for his trip to Atlanta on April 11th 2023. After washing his clothes and placing them in the dryer and taking a quick nap The Plaintiff would awake to find the laundry room locked, with his blanket and clothes inside. When The Plaintiff would ask he would be informed that the laundry room was locked due to it being Sunday and in the afternoon, both which were excuse due to the laundry room being open the previous Sunday and always been open whenever The Plaintiff would arrive at The Shelter for dinner around 5pm. After asking the Clients to open the door he would be told it was locked by The Shelter Staff.

72. The Plaintiff would then head downstairs and ask The Shelter Staff why the laundry room was locked which they would respond to with a confused reaction. The Plaintiff would then ask The Shelter Staff to open the door which they would respond to by stating they would not and that he would have to wait for them to open it when they felt like it. The Plaintiff would then explicitly inform The Shelter Staff that he already knew what was occurring and that they needed to stop before he went Secret Service on them and all that implies which would see The Shelter Staff respond by preverbally enlarging their chest which would see The Plaintiff respond by punching a frame that would cause the plexiglass it was holding to fall to the ground.

73. The Plaintiff would then be forced outside of the building living area and into the security veranda area and told to wait until The Police responded for him to receive his belongings with him being explicitly informed that The Police would have to retrieve his belongings. Due to the corrupt nature of said situation and already knowing the connection between The Police and Shelter Staff, due to being explicitly told when he was an infant that said Officers would allow them to rob him, The Plaintiff already knew what was occurring. The Plaintiff would give benefit of doubt and call 911 to report a robbery attempt. After watching a City of New York Police Department cruiser that happened to be located in the area decide to not responds and instead go the other way The Plaintiff would phone the FBI New York Field Offices and after realizing that it was Sunday Afternoon he would decide not to sit idly by while he was robbed and would proceed to go upstairs to retrieve his belongings.

74. The Plaintiff would be stopped by a female security guard who would block the doorway, as part of their larger scheme. The Plaintiff would reasonably push said guard out of the way which would receive a response from everyone in the building that The Plaintiff was a woman-beater, a dog whistle to when The Plaintiff was a child and females would lie on him to depict him as a misogynist and validate their preconceived scheme to attack The Plaintiff under the ruse that he was a weak man something that The Plaintiff already informed everyone when he was a child to not call him and invokes a hatred response from The Plaintiff.

75. The Plaintiff would then head upstairs where he would be followed and harassed by a bunch of bitch ass mama's boys that would get deliberately uncomfortably within The Plaintiff's personal space and in a threatening manner. Once upstairs The Plaintiff would unlock his locker and procced to pack his belonging in his suitcase, with the intended goal of leaving the shelter and removing himself from the situation. While The Plaintiff was packing his belongings he would be surrounded on all side, with there being no possible exit, by the whole dorm which consisted of at least 20+ people and repeatedly threatened, accosted, and harassed and would have several Clients get in his

1:20-cv- – Yaya Jallow v. – Judge Hon.

personal space in a threaten manner hoping to provoke a response from The Plaintiff which would eventually result in a fight. After watching The Plaintiff beat the shit out of the Client that initiated the altercation by swinging at him one Shelter Staff member would get involved in the fight, the same Shelter Staff member that puffed his chest when The Plaintiff asked for his laundry and due to his size believed he could manhandle The Plaintiff and as such got manhandled by The Plaintiff which would be used as an excuse by all the Clients to attack The Plaintiff, in what was probably a ploy to win favor with The Shelter Staff and attack The Plaintiff, as they repeatedly told him to his face when he was a child. The Plaintiff would end up getting kicked and attacked by at least 20+ people and when that wouldn't do much to The Plaintiff said Shelter Staff member would then proceed to attempt to choke The Plaintiff in an attempt to kill him in the same manner and exactly like Jordan Neely. Said same Shelter Staff member would then go onward to make categorically false statements to the responding City of New York Police Department Officers about what had occurred.

76. During the course of said lynching attempt The Plaintiff would have his glasses, cellphone, and suitcase stolen which was only done, and proves their scheme, to destitute and disenfranchise him due to there being no reason for that besides to blind The Plaintiff and stop him from being able to use his phone to file his unemployment insurance claims, something that since the arrest has willfully & deliberately been withheld from The Plaintiff no matter how many time he would certify his claim, no with valid nor legitimate reason being provided to him, which just shows the intent and objective of the personnel at the New York State Department of Labor, nor being able to contact anyone to report their actions.

77. The Plaintiff would then head downstairs with his single remaining backpack and wait outside for the City of New York Police Department to respond so he could file a robbery report. Once the Shelter Staff called 911 the City of New York Police Department would respond toot-sweet. Officer Milton E. Calderon (Badge #4165) would respond and ask The Plaintiff what occurred which The Plaintiff would begin explaining and before even hearing what occurred would place The Plaintiff under arrest despite him actively throwing up, due to getting kicked repeatedly in the sides. The Plaintiff would get placed in a patrol car and would even witness as Officer Calderon would attempt to leave his backpack at the scene to get further robbed, giving benefit of doubt could have been done probably because he believed it was someone else but due to The Plaintiff's memories isn't possible and just shows the criminal enterprise nature of the whole events and the involvement of members of the City of New York Police Department. The Plaintiff believes all this was done to enrage The Plaintiff and get him to kill Officer, which can happily be done once The Plaintiff get his Father's gun.

78. The Plaintiff would get transferred to the 75th precinct where he would get charged with fraudulent trumped up charges. Once The Plaintiff would get before a Judge and despite not being able to see and informing the Judge of that he couldn't see he would be sent to Riker's, as a continuation of the Judiciary 's attempts to treat him like a criminal and destitute and disenfranchise him. The Plaintiff would spend the next 5 days at Riker's and after getting released on a Friday, once again to give said personnel an excess for not doing anything, The Plaintiff would get placed on "probation", in a scheme to treat The Plaintiff as a criminal felon and get him to act like one despite the made-up reason of having him get in touch with "old friends".

79. The Plaintiff would once again attempt to obtain the arresting Officer's name and badge number, before being provided it by his attorney, and would get stonewalled with the Officers at the 75t precinct choosing to willfully and deliberately not provide The Plaintiff with any form of service from refusing to provide the identifying information to even refusing to file The Plaintiff's robbery report, with them going with the excuse that it was a form of "retaliation" to file a report about the robbery he experienced

80. The Plaintiff would continue to file multiple complaints to multiple agencies and departments outlining the blatant corruption, unauthorized racism, and criminal enterprise that was being operated by the personnel of the municipality of the State & City of New York which would all receive moot or muted responses with said agencies and departments using the excuse that they lacked any authority to do anything, which The Plaintiff would happily love to gain the authority to

1:20-cv- – Yaya Jallow v. – Judge Hon.

do something about.

81. The Plaintiff would receive hostile and discriminatory treatment from the City of New Yok Department of Homeless Services Personnel, when he would go through the exact same treatments he got when he was first released from Riker's in June 2022. Due to an order of protection against him by the Shelter Staff he was unable to return to his assigned Shelter and wouldn't be given a transfer at all even when he would explain this, with that being the intention of those DHS personnel to either force The Plaintiff into breaking the order of protection and getting sent back to Riker's or sleeping outside on the streets in destitution.

52. Allegation

1. The Plaintiff was intentionally & willfully discriminated against due to willfully chosen preconceived notions & beliefs.
2. The New York Unified Court System was willfully & deliberately in on any conspiracy against The Plaintiff.
3. Personnel at the City & State of New York were aware & apparently involved in said schemes and conspiracies to disenfranchise The Plaintiff under wrong loser justification.
4. The Shelter Staff at Kenton Hall and the Third Street, and the New York Shelter System personnel in general, are willfully and intentionally operating a Criminal Enterprise.
5. The Plaintiff was forced to fight New York Department of Corrections Officers to facilitate his robbery by said Officer's associates.
6. The warrant hold was used to stop The Plaintiff from obtaining his property and to destitute him for the weekend.
7. The Plaintiff was robbed of his property by an Enterprise consisting of several Project Renewal personnel that used criminal methods to rob, intimidate, & retaliate against him.
8. Personnel with the City of New York Police Department were actively assisting members of said Criminal Enterprise who they have known since The Plaintiff was a child.

### VII. Damages

53. The Plaintiff is seeking the following compensatory damages:

1. Awarding The Plaintiff a total monetary relief of *$116,255:*
    1. Legal Cost: *1,395*
        1. Case Research / Prep: *125*
        2. Case Print-Outs: *20*
        3. Litigation Cost/Fees: *1,250*
    2. Compensation: *114,860$*
        1. Stolen Property: *2,460*
            1. Clothes: *300*
            2. Nintendo Switch: *200*
            3. Nintendo Switch Accessories: *80*
            4. Nintendo Switch Games: *90*
            5. Cellphones (x2): *220*
            6. Laptop: *350*
            7. USD Flash Drives: *50*
            8. Suitcases (x2): *160*
            9. Money in Suitcase: *100*
            10. Suitcase Contents (minus clothes): *400*
            11. Glasses: *330*
            12. General Possessions: *180*
        2. Racketeering Multiplier: *7,380*
        3. Missed Wages: *2,500*
        4. Lost Opportunities: *5,000*
        5. Emotional Stress / Damage: *10,000*
        6. Medical Cost: *20,000*
        7. Personal Injury Claim Amount: *67,520*

1:20-cv- – Yaya Jallow v. – Judge Hon.

2. for the following reasons:
    1. In accordance with all mentioned Federal Statutes, pre-standing Cases, & due to The Plaintiff experiencing all mentioned monetary loses.
    2. Due to the time spent thinking and analyzing of the events outlined in this complaint instead of time that could have been spent on The Plaintiff's securities & equities endeavors and any one of the similar hobbies The Plaintiff spends his free personal time on, The Plaintiff believes the *116,255$* is a fair adequate price tag for this litigation.

2. A judgment pursuant to 28 U.S.C. §2201 & §1343 noting that a good chunk of The Defendants willfully and intentionally operated a Criminal Enterprise with the intention of robbing The Plaintiff, and other victims, of their possessions and property and engages in racketeering activities with the ultimate goal of endangering, destituting, disenfranchising, & murdering The Plaintiff.
3. Equitable & verbatim treatment of all perpetrators.
4. Such other reliefs as This Court may deem just and proper.

### *VIII. Exhibits*

*Exhibit 01:* Civilian Complaint Review Board Jailing Instructions
*Exhibit 02:* DCA 2020 The Local Complaint Editing
*Exhibit 03:* June 3rd 2022 Arrest Injury Form
*Exhibit 04:* June 3rd 2022 Arrest Injury Form Acknowledgement
*Exhibit 05:* Kenton Hall Property Sheet (Theft)
*Exhibit 06:* Project Renewal Stolen Property Message Submission
*Exhibit 07:* Russ Novak Voicemail Transcripts
*Exhibit 08:* Shelter Transfer Protocol
*Exhibit 09:* Axos Federal Reserve Complaint
*Exhibit 10:* Axos Account Closure Check (Missing 20$)
*Exhibit 11:* New York State Commission on Judicial Conduct Complaint Acknowledgement
*Exhibit 12:* New York State Commission on Judicial Conduct Complaint Response
*Exhibit 13:* Civilian Complaint Review Board Expanded Jurisdiction Question
*Exhibit 14:* United States Postal Service Complaint
*Exhibit 15:* New York Court of Claims Action
*Exhibit 16:* The Ribbon Complaint
*Exhibit 17:* November 28th 2022 HRA Visit Papers
*Exhibit 18:* HRA Statement of Benefits
*Exhibit 19:* New York State Department of Labor Confirmation Letter
*Exhibit 20:* New York State Department of Labor Unemployment Insurance Payments
*Exhibit 21:* New York State Department of Labor Claim Refusal
*Exhibit 22:* New York State Department of Labor New Hire Technical Issues
*Exhibit 23:* Federal Department of Labor Complaint
*Exhibit 24:* 01/31/2023 Smoke Shop Price Gouging Complaint Outcome
*Exhibit 25:* United States Department of Justice Civil Rights Complaint (285209-HBD)
*Exhibit 26:* Forbell Charge Sheet
*Exhibit 27:* April 19th 2023 New York City Commission on Human Rights Complaint
*Exhibit 28:* United States Government Accountability Complaint

*Notary*

I, *Yaya Jallow*, swear and affirm that I have read the foregoing packet and know the contents thereof: that same is true to the best of my own knowledge, except as to the matter here stated to be alleged upon information, and as to these matters I believe them to be true.

Date: 03/4/2023

Toni Incorvaia
Notary Public, State of New York
Reg. No. 04IN6435975
Qualified in New York County,
Commission Expires July 5, 20___

State of New York
County of New York

Sworn to before me this
___ day of _____ MAY 1 1 2023

Yaya Jallow • *The Plaintiff, pro se*
yjallow96@outlook.com • (718) 200-5369
4380 Bronx Boulevard, The Bronx, New York 10466